# HENRIETTE COQUELET

### vs.

# UNION HOTEL COMPANY.

*Hotel Proprietor—Refusal of Room—Malice—Punitive
Damages.*

In an action against a hotel proprietor for refusing to
assign a room to plaintiff and her husband, *held* that, in view
of the lack of evidence of malice on defendant's part in such
refusal, there was no reversible error in sustaining a demurrer
to a count of the declaration which asserted such malice as
ground for a finding of punitive damages. p. 547

An assumption by plaintiff, based on the tone used by
defendant's employee in refusing to assign plaintiff and her
husband a room in its hotel, that such employee intended to
imply that they were not married is insufficient as a basis for
an award of punitive damages as for slander. p. 547

In the absence of malice or wantonness, or circumstances of
aggravation, one can recover, on account of refusal of hotel
accommodations, only such damages as were the immediate and
necessary consequences of the wrongful act. p. 548

A rule of a hotel that persons without baggage shall not be
given a room, in the absence of proper identification, is entirely
reasonable. p. 549

*Decided December 1st, 1921.*

Appeal from the Baltimore City Court (SOPER, C. J.).

Action by Henriette Coquelet against the Union Hotel
Company. From a judgment for defendant, plaintiff ap-
peals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, and STOCKBRIDGE, JJ.

*Lucius Q. C. Lamar,* for the appellant.

*Randolph Barton, Jr.,* with whom was *Malcolm H. Lauch-heimer* on the brief, for the appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

In June, 1919, Henriette Coquelet went from Washington to the City of Baltimore with her husband, Lieutenant Henri Coquelet. The trip was one of recreation. The lieutenant had been seriously wounded in the world war, besides having been exposed to shell shock on several occasions. He was at the time in exceedingly poor health as the result of this experience and, though in some way attached to the French Embassy in Washington, was hardly in a condition to perform any duties involving close application.

The afternoon was spent in Baltimore and in the evening Lieutenant and Madame Coquelet visited a moving picture show somewhere apparently in the center of the city. At the conclusion of the show, Lieutenant Coquelet was feeling badly and attributed it to lack of nourishment, and accordingly the couple strolled up the street past the Caswell Hotel, which was operated by the Union Hotel Company, where they dropped into the grill room for supper.

Before the supper was over Lieutenant Coquelet found himself feeling worse, and proposed to his wife that they remain in Baltimore over night, to which she assented. He accordingly left the table, went to the office of the hotel, and registered as Henri Coquelet and wife. Having registered, he inquired the price of rooms, was told the price of the rooms and, according to the testimony of Madame Coquelet, was told, after the clerk had learned that they had no baggage, that they could not be accommodated at the hotel with a room. He returned to the grill room, where he reported the substance of the interview he had just had to his wife, and at the conclusion of their repast both of them entered the office, and Madame Coquelet went to the clerk in charge, F. G.

Murray, and asked for the reason that they were refused lodging for the night.

According to Madame Coquelet's own testimony, she was attired in a "fluffy French dress and picture hat and some other things," and the clerk declined to give any reason for his refusal to give them a room and, upon her insistence for a reason, asked if he thought they were not married. To this he made no response, but invited them to leave, and by her own testimony she "assumed" that the reason of it was that he had doubt as to their being married.

She inquired for the manager of the hotel, and Mr. Busick, the assistant manager of the company, having charge of this particular hotel, coming in about that time, the conversation was continued with him, and he declined to recede from the position which had been taken by Mr. Murray. Thereupon Lieutenant and Madame Coquelet left the Caswell and went to another hotel, and a few days later Madame Coquelet instituted the present action against the hotel company.

The testimony on behalf of the hotel company discloses some variations from that given by Madame Coquelet, but hardly of a sufficiently serious character to call for more than this passing comment.

At the trial of the case, eight bills of exceptions were reserved, seven of which related to rulings upon evidence, and the eighth to the ruling of the court upon the prayers.

At the time of the filing of the declaration and the amended declaration, demurrers were interposed. The demurrers to the first and second counts were overruled, and that to the third sustained. The burden of the third count of the declaration was thav 'he act of the defendant was malicious, as forming a basis for a finding of punitive damages.

Ordinarily a case stated in the language of this third count would have so far justified the finding as to have made the count good, and if there had been any evidence to sustain the theory of the plaintiffs on the question of malice, it would have been necessary to hold that, in sustaining the

demurrer to this count, the court committed an error. When, however, the evidence is examined, there is nothing in any manner to bear out the allegation of malice, and consequently no reversible error can be predicated upon the action of the trial court in sustaining the demurrer, since it would have presented merely an error without injury. The exceptions upon the questions of evidence are in a very similar position. Thus the question asked of the plaintiff by her counsel upon re-examination, objection to which was sustained by the court, was: "Counsel on the other side asked whether there was any hostility on the part of the clerk after you had engaged him in conversation. Was there actual hostility, could you tell that his remarks were hostile from his tone?"

By this the plaintiff was asked to state whether there was any hostility manifested toward her by the hotel clerk, not in what he said, but in the tone in which he said it. This method of proving malice is very close to the border line, for, as was said in *Beeler* v. *Jackson,* 64 Md. 589, "The plaintiff is bound to prove the existence of malice as the real motive of the defendant's language, but it is not necessary to prove that there was personal spite or ill-will toward the plaintiff. * * * Evidence of any act or circumstances tending to show the want of good faith may be offered to show the existence of malice."

So far as the plaintiff was concerned, there was no language used by the clerk, Murray, or by Mr. Busick, which was in itself necessarily slander. It is perfectly true that to accuse any woman, whether married or unmarried, of unchastity, is slanderous, but no such accusation, by the plaintiff's evidence, was made, except as she assumed it to have been intended by the tone of the employee with whom she was talking, and this is entirely too remote upon which to predicate a recovery of punitive damages.

This aspect of the case, namely malice, was elaborately considered in the case of *Brinsfield* v. *Howeth,* 107 Md. 284, wherein was repeated that which has been the long recognized

rule in this State, that words are to be construed in the plain, popular sense in which people would naturally understand them, or if there were extrinsic circumstances by reason of which a different meaning was understood by the hearers at the time that the words were uttered, these facts should be alleged by the way of inducement; that the innuendo cannot enlarge the natural and ordinary meaning of the words.

Thus far nothing has been said of the testimony offered on behalf of the defense. By that testimony, no such conversation as that narrated by Madame Coquelet took place with the clerk, Murray, and she, in describing her conversation with Mr. Busick, does not seem to make any point of anything improper either in the language, tone or manner of Mr. Busick. The plaintiff further testified that for the purpose of identifying herself, free from any imputation, she presented her card to Mr. Murray and, while Murray denies this, yet his testimony upon that point is not as conclusive as upon most others, but as she "assumed" that her conduct was impugned from Murray's tone rather than from anything he said, and as her testimony fails to show that the conversation was overheard by anyone, this discrepancy in the testimony amounts to but very little in this case.

This brings us to a consideration of the prayers. The plaintiff's first and second prayers were granted and are therefore not covered by the eighth exception. The third prayer, which was refused, was on the question of damages. This prayer, as drawn, was not based upon any question of compensatory damage being suffered by reason of actual injury inflicted, excepting in so far as the question of the mortification of the plaintiff at the refusal could be so regarded and "in the absence of malice, or wantonness or circumstances of aggravation, the plaintiff was entitled to recover such damages only as were the immediate and necessary consequences resulting from the wrongful act of the defendant"; *North. Cent. Rwy Co.* v. *O'Connor*, 76 Md. 217. In view of this settled rule, it is difficult to see how any dam-

age other than nominal damages could have been properly awarded.

The first prayer of the defendant and the prayers designated respectively as defendant's 1-A, 1-B and 1-C were all refused. These prayers were in effect to instruct the jury that their verdict must be for the defendant. The pleadings in the case, taken together, undoubtedly made out a case where, had there been any proper evidence of malice, they could not have been granted, and their refusal was correct, and the same may be said of defendant's 1-D prayer. The second prayer of the defendant has already been covered in what has been previously said. The sixth and seventh prayers of the defendant were refused, and the plaintiff can hardly be said to have been injured in any respect by their refusal.

The ninth prayer of the defendant was also properly refused, as being sufficiently covered by the action of the court on defendant's eighth prayer, which was to the effect that there was an established rule of the hotel that persons would not be assigned to a room there who were without baggage, in the absence of proper identification. This rule was one entirely reasonable in its character. When Lieutenant Coquelet registerd, there is nothing to show that he was in any manner identified to the receiving clerk of the hotel except such as the receiving clerk might have inferred from his appearance. That element in the case seems to have been confined to the interview between Madame Coquelet and the receiving clerk or assistant manager at a subsequent time, when she produced a visiting card and certain letters.

No error is to be found therefore in the action of the trial court with regard to the granting of the eighth prayer. The judgment appealed from will accordingly be affirmed, as the errors, if any, committed by the trial court, were not of such a character as to unduly prejudice the plaintiff.

*Judgment affirmed, with costs.*